**PROFESSIONAL AND BUSINESS MEN'S LIFE INSURANCE COMPANY, a Corporation, Plaintiff,**

v.

**BANKERS LIFE COMPANY et al., Defendants.**

**No. 707.**

United States District Court

D. Montana, Helena Division.

March 24, 1958.

On Petition for Leave to File Motion to Rehear April 8, 1958.

Order Filed June 30, 1958.

276

McCaffery, Roe & Kiely, Butte, Mont., and Skedd, Harris & Massman, Helena, Mont., for plaintiff.

Corette, Smith & Dean, Butte, Mont., for Bankers Life Co., Northern Life Ins. Co., and Prudential Life Ins. Co. of America.

Coleman, Lamey & Crowley, Billings, Mont., for Equitable Life Assur. Society of U. S., Franklin Life Ins. Co., Mut. Life Ins. Co. of N. Y., New York Life Ins. Co., and Paul Revere Life Ins. Co.

Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for Kansas City Life Ins. Co., Northwestern Nat. Life Ins. Co., and Occidental Life Ins. Co. of Cal.

Ralph J. Anderson, Helena, Mont., for Nat. Reserve Life Ins. Co.

Small & Herron, Helena, Mont., for Farmers New World Life Ins. Co.

Toomey & Hughes, Helena, Mont., for State Farm Life Ins. Co.

Gunn, Rasch & Gunn, Helena, Mont., for Mut. Benefit Life Ins. Co. and Ohio Nat. Life Ins. Co.

Rasch & Patterson, Helena, Mont., for Western Life Ins. Co.

Weir, Gough & Matson, Helena, Mont., for Metropolitan Life Ins. Co.

Dan R. Lovelace, Bozeman, Mont., for James H. Dickson.

Luxan & Scribner, Helena, Mont., for all other defendants.

John T. Vance, Helena, Mont., for Bankers Life & Cas. Co. of Ill.

William Mussman (of Pillsbury, Madison & Sutro), San Francisco, Cal., for Bankers Life Co. and others.

MURRAY, Chief Judge.

The complaint in this case contains six counts. The first count is based upon alleged violation of the federal anti-trust laws; Counts two, three and four are based on defamation; and Counts five and six allege damages as the result of violations by defendants of certain Montana statutes. Each of the defendants filed separate motions to dismiss directed to each of the counts. However, argu-ments, both oral and written, were jointly submitted by all of the defendants.

### Count One

■ The first ground of the motion to dismiss Count One is that the Court has no jurisdiction thereof. The interstate commerce alleged to have been restrained by the acts of the defendants in this case is the business of life insurance, and defendants insist that by reason of the McCarran Act jurisdiction has been taken away from federal courts of suits for violation of the Clayton and Sherman Acts in the business of insurance.

The McCarran Act provides generally that the Sherman Act and the Clayton Act shall apply to the business of insurance only to the extent that such business is not regulated by State law. The defendants say that the State of Montana has adequate laws regulating, by prohibiting, trusts, conspiracies and monopolies and that therefore by virtue of the McCarran Act the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1–7, 15 note, 12 et seq., 1011 et seq., are inapplicable in Montana so far as the business of insurance is concerned.

The validity of the McCarran Act in its attempt to confer upon the states the power to regulate and tax the business of insurance, even when such business is conducted between the several States, has been established in the cases of Prudential Insurance Co. v. Benjamin, Insurance Commissioner, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342, and Wilburn Boat Co. v. Fireman's Fund Insurance Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337.

Plaintiff, in drafting its complaint, was apparently aware of the McCarran Act and sought to avoid its application to this case by alleging in Paragraph XIX of Count One of the complaint that the State of Montana has enacted no regulations or laws in connection with the regulation of monopolies or restraints of trade in the business of life insurance. By this allegation and by the assertion in plaintiff's brief that the allegation is an essential one, plaintiff tacitly concedes

that if the State of Montana has by law provided for the regulation of monopolies and restraints of trade in the business of life insurance, this Court has no jurisdiction of the present action, unless, of course, the case falls within another exception in the McCarran Act which will be hereafter discussed.

Turning then to the law of Montana, we find the following provisions in Article XV, Section 20:

"No incorporation, stock company, person or association of persons in the state of Montana, shall directly, or indirectly, combine or form what is known as a trust, or make any contract with any person, or persons, corporation, or stock company, foreign or domestic, through their stockholders, trustees, or in any manner whatever, for the purpose of fixing the price, or regulating the production of any article of commerce, or of the product of the soil, for consumption by the people. The legislative assembly shall pass laws for the enforcement thereof by adequate penalties to the extent, if necessary for that purpose, of the forfeiture of their property and franchises, or in case of foreign corporations, prohibiting them from carrying on business in the state."

Article III, Section 29 of the Montana Constitution, provides:

"The provisions of this constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."

Section 94–1104, R.C.M.1947, provides:

"Unlawful trusts and monopolies —penalty. Every person, corporation, stock company, or association of persons in this state, who, directly or indirectly, combine or form what is known as a trust, or make any contract with any person or persons, corporation, or stock companies, foreign or domestic, through their stockholders, directors, officers, or in any manner whatever, for the pur-

pose of fixing the price or regulating the production of any article of commerce—the phrase 'articles of commerce,' as herein employed, shall and does include not only those articles which are generally, popularly, and legally known as articles of commerce, but also gas, water, water power, electric light, and electric power, for whatever purpose used or employed—or of the product of the soil for consumption by the people, or to create or carry out any restriction in trade, to limit productions, or increase or reduce the price of merchandise or commodities, or to prevent competition in merchandise or commodities, or to fix a standard or figure whereby the price of any article of merchandise, commerce, or product, intended for sale, use, or consumption, will be in any way controlled, or to create a monopoly in the manufacture, sale, or transportation of any such article, or to enter into an obligation by which they shall bind others or themselves not to manufacture, sell, or transport any such articles below a common standard or figure, or by which they agree to keep such article or transportation at a fixed or graduated figure, or by which they settle the price of such article, so as to preclude unrestricted competition, is punishable by imprisonment in the county jail for a period not less than twenty-four hours or more than one year, or by fine not exceeding twenty-five thousand dollars, or both."

In addition, Title 40, R.C.M.1947, contains extensive regulations of insurance and insurance companies.

Plaintiff contends that because the provisions of Section 94–1104, R.C.M. 1947, are not included in Title 40, the Chapter on Insurance in the Montana Code, the provisions of the former section prohibiting monopolies and conspiracies in restraint of trade do not apply to the business of life insurance. However, Section 94–1104 is a part of the

general criminal code of the State of Montana which applies to all, and by its specific wording 94–1104 applies to every person, corporation, stock company or association of persons in the State. Under the provisions of that statute, a conspiracy to, restrain trade in insurance in Montana is as illegal as it would be under the provisions of the Sherman Act (were it not for the McCarran Act).

Plaintiff likewise contends that the Legislature of Montana in 1957, when it passed Chapter 42 of the Session Laws of 1957, 'recognized that there was no regulation of monopolies and conspiracies in restraint of trade in the business of insurance in Montana. Chapter 42 of the Laws of Montana 1957, directed the State Auditor and Commissioner of Insurance to prepare and submit to the next legislative assembly a bill providing a modern and adequate code of insurance laws for the State of Montana regulating the insurance business, and appropriated the sum of $25,000 for the Commissioner of Insurance to make the comprehensive study necessary to prepare such a code. There is nothing in Chapter 42, however, that in any way suggests that the provisions of Section 94–1104, R.C.M.1947, do not apply to insurance companies or the business of insurance.

Thus it is apparent that Montana having by law regulated conspiracies in restraint of trade in the insurance business, by prohibiting them, this court, because of the provisions of the McCarran Act, would have no jurisdiction of a suit for violation of the Sherman and Clayton Acts involving the business of insurance, unless the suit falls within an exception to the McCarran Act.

Section 3(b) of the McCarran Act (Section 1013(b), Title 15 U.S.C.A.) contains the following provision:

"Nothing contained in this chapter shall render the said Sherman Act inapplicable to.any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

Plaintiff contends that the complaint in this case contains allegations of an agreement to boycott, coerce or intimidate and acts of boycott, coercion and intimidation. Defendants' position is first, that the plaintiff, having proceeded upon the theory that the Sherman and Clayton Acts were applicable in this case because the State of Montana had no laws regulating monopolies or restraints of trade in the business of insurance, cannot now change its theory to come under the exception contained in Section 3(b) above quoted of the McCarran Act; and second, that in any event the complaint contains no allegations of boycott, coercion or intimidation.

As previously stated, it is obvious that plaintiff's complaint was drawn on the theory that Montana had no laws regulating conspiracies to restrain trade in the insurance field, and that, therefore, under the McCarran Act, the Sherman and Clayton Acts would apply to such conspiracies to restrain trade in the insurance field in Montana. It seems equally obvious that plaintiff's argument that this case comes under the boycott, coercion or intimidation exception to the McCarran Act does involve a change of theory on plaintiff's part and was added as an afterthought. No direct charge of boycott, coercion or intimidation is contained in the complaint, and indeed the words "boycott", "coercion" or "intimidation" do not appear in the complaint. Be that as it may, however, under the Federal Rules of Civil Procedure, 28 U.S.C.A., a change in plaintiff's theory is not prohibited, nor is the direct allegation of the ultimate fact of boycott, coercion or intimidation necessary if from what is alleged boycott, coercion or intimidation can be found. The Federal Rules have done away with the narrow "theory of the pleadings" doctrine, and a party is not required to pick and stick to one theory of law; and the courts will go very far in finding a basis on which to sustain a pleading as against a motion to dismiss for failure to state a claim. 2 Moore's Federal Practice,

Sec. 8.14, pp. 1656, 1657. Therefore, if the complaint does contain allegations which would bring this action within the boycott, coercion or intimidation exception to the McCarran Act, it does not fail because it may have been drawn with some other theory in mind.

Looking then to the complaint, we find allegations to the effect that defendants entered into a conspiracy to prevent the plaintiff from carrying on a life insurance business in the State of Montana and to destroy plaintiff's competitive efforts in the sale of life insurance policies in Montana, and that pursuant to said conspiracy the defendants did certain acts, among which were the following:

(1) Attempted to induce and did induce the general public to refrain from doing business with plaintiff by the publication of an advertisement (Exhibit "B" to the complaint) in the Bozeman Chronicle, a newspaper of general public circulation both in and beyond the State of Montana.

(2) Sought to upset existing insurance policies and to discredit plaintiff and bring about policy lapsations and cancellations of application.

(3) Attempted to induce and did induce the general public to refrain from doing business with plaintiff by the publication of an advertisement (Exhibit "C" to the complaint) in the Havre Daily News, a newspaper of general circulation both in and beyond the State of Montana, and by the publication and circulation of copies of said Exhibit "C" by handbills and by mail.

(4) Attempted to have plaintiff's license to do business in Montana revoked by complaining to the Commissioner of Insurance concerning plaintiff and making false charges against plaintiff to said Commissioner, and by agitating and urging policyholders of plaintiff to complain to said Commissioner.

(5) Attempted to dissuade and did dissuade prospective insurance agents from representing plaintiff.

The allegations of these acts are the allegations upon which plaintiff relies to bring the case within the so-called boycott, coercion or intimidation provisions of the McCarran Act.

Defendants assert that none of these acts, nor all of them taken together, amount to a boycott and that the situation existing in this case is just not one wherein defendants were in a position to use a boycott. In support of this position they cite the definition of boycott found in United States v. Waltham Watch Co., D.C., 47 F.Supp. 524, 532, and Fashion Originators Guild v. Federal Trade Comm., 2 Cir., 114 F.2d 80, to the effect that a boycott is "a combined refusal to deal with anyone as a means of preventing him from dealing with a third party." That definition of boycott in those two cases, however, is not, and did not purport to be a complete and exclusive definition of the term. In those cases, the facts showed a combined refusal to deal with persons as a means of preventing those persons from dealing with third persons, and the courts were simply saying that under those facts there was a boycott.

In Paramount Enterprises v. Mitchell, 104 Fla. 407, 140 So. 328, 330, the Supreme Court of Florida made the following statement concerning what a boycott is:

"In its more modern significance, the term 'boycott' connotes a variety of action, ranging from a mere withdrawal of business by an individual to an organized effort by associated individuals to procure all others to withdraw from such intercourse. *It is accomplished by means ranging from simple persuasion to the disturbance of business relations with third persons and the person boycotted by physical intimidation or violence.*"

The Supreme Court of Ohio in W. E. Anderson Sons Co. v. Local Union 311,

etc., 156 Ohio St. 541, 104 N.E.2d 22, at pages 32 and 33, defined "boycott" as follows:

"A boycott may be defined in general terms as a concerted refrainment from business relations with another, *or a concerted persuasion of third persons outside the combination to so refrain. It may be primary where there is a concerted refrainment from business relations with another, or by peaceful means a concerted inducement of others outside the combination to so refrain;* or it may be secondary where there is not merely a concerted refrainment from business relations with the person against whom the boycott is directed or by peaceful means a concerted inducement of others outside the combination to so refrain, but an exercise of economic pressure upon such others to cause them to refrain from business relations with the person against whom the boycott is directed, through fear of loss or damage to themselves if they refuse to do so."

In Kingston Trap Rock Co. v. International Union of Operating Engineers, Local 825, etc., 129 N.J.Eq. 570, 19 A.2d 661, 667 it was said:

"A combination not merely to refrain from dealing with complainant, *or to advise or by peaceful means to persuade complainant's customers to refrain* [is a] ('primary boycott')."

The Supreme Court of the United States in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 176, 65 L.Ed. 349, in an antitrust action, has also defined boycott along the lines that the Florida, Ohio and New Jersey courts did in the above quotations, when it said:

"The sustance of the matters here complained of is an interference with complainant's interstate trade, intended to have coercive effect upon complainant, and produced by what is commonly known as a 'secondary boycott'; that is, a combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain ('primary boycott'), but to exercise coercive pressure upon such customers, actual or prospective, in order to cause them to withhold or withdraw patronage from complainant through fear of loss or damage to themselves should they deal with it."

■ While it is the secondary boycott that courts have generally declared illegal, the primary boycott may also be illegal. In W. E. Anderson Sons Co. v. Local Union 311, etc., supra, 104 N.E.2d at page 33, the Court said:

"Although primary boycotts for legitimate purposes and without the employment of unlawful means are not actionable, an actionable boycott results if it is prosecuted through improper means *or for illegal purposes.*"

That a primary as well as a secondary boycott may be a violation of the Sherman Act is pointed out by the Supreme Court in Duplex Printing Press Co. v. Deering, supra, 254 U.S. at page 466, 41 S.Ct. at page 176, 65 L.Ed. 349, in the following language:

"As we shall see, the recognized distinction between a primary and a secondary boycott is material to be considered upon the question of the proper construction of the Clayton Act. But, in determining the right to an injunction under that and the Sherman Act, it is of minor consequence whether either kind of boycott is lawful or unlawful at common law or under the statutes of particular states. Those acts, passed in the exercise of the power of Congress to regulate commerce among the states, are of paramount authority, and their prohibitions must be given full effect, irrespective of whether the things prohibited are lawful or unlawful at common law or under local statutes."

■■ Under the Sherman Act, a boycott, primary or secondary, is illegal if

it is intended to restrain and restrains commerce among the states. And it is to be noted that the exception to the McCarran Act contained in Section 1013(b), Title 15 U.S.C.A. is not limited to agreements to secondarily boycott or to acts of secondary boycott, but applies to all boycotts.

Caldwell-Clements, Inc. v. Cowan Publishing Corp., D.C., 130 F.Supp. 326, is another case which recognizes a violation of the Sherman Act may be accomplished by "peaceful persuasion". The "peaceful persuasion" alleged in that case, although not called a boycott by the court, amounts to a boycott under the above definition of that term.

 The allegations in plaintiff's complaint then, to the effect that pursuant to the conspiracy to drive plaintiff out of the life insurance business defendants attempted to induce and did induce the general public to refrain from doing business with the plaintiff, by the insertion of the ads in the Havre and Bozeman newspapers, and the circulation of the handbill, constitute a sufficient allegation of a boycott, as defined above, to bring this action within the boycott exception to the McCarran Act. Whether such ads are in fact inducements or attempts to induce the general public to refrain from doing business with plaintiff, as alleged in the complaint, is another question, a question of fact to be resolved by the trier of fact from a consideration of the ads and all the circumstances surrounding their publication.

The Court experienced some doubt as to whether a private civil suit for treble damages was saved by the exception to the McCarran Act contained in Section 3(b) thereof. The exception provides that "nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott" and so forth. The Clayton Act is not made applicable to cases of boycott, coercion or intimidation by the exception; and it is the Clayton Act which is popularly considered as granting the private right of action. According to the His-

torical Note found following Section 1013, Title 15, the Sherman Act is classified to Sections 1–7 of Title 15, and the Clayton Act is classified to Sections 12–27 and 44 of Title 15. The private right of action for treble damages is granted by Section 15 of Title 15, which is within that part of the Title classified as the Clayton Act. However, Section 7 of the Sherman Act, as originally enacted, granted a private right of action for treble damages to persons injured by violations of the act in substantially the same words as now found in Section 15 of Title 15, and Section 7 of the Sherman Act has never been repealed. According to the U.S.C.A. tables which show where Acts of Congress have been incorporated in the United States Code Annotated, Section 7 of the Act of July 2, 1890, which is the Sherman Act, is incorporated in the Code as Section 15 of Title 15. Therefore, Section 15 of Title 15 is as much a part of the Sherman Act as it is of the Clayton Act, and by making the Sherman Act applicable to cases of boycott, coercion and intimidation, Section 3(b) of the McCarran Act does save the private right of action for treble damages.

The second ground of the motion to dismiss the first count is that the count fails to allege facts showing a violation of the antitrust laws, in that there are insufficient allegations of public injury and insufficient allegations of actionable private injury to the plaintiff.

 In considering this phase of the motion, several principles must be borne in mind. First, dismissal of a complaint for reasons not going to the merits is viewed with disfavor in federal courts. Rennie & Laughlin, Inc. v. Chrysler Corp., 9 Cir., 242 F.2d 208, 213; Nagler v. Admiral Corp., 2 Cir., 248 F.2d 319, 322. Second, contrary to the urgings of counsel for defendants, and the holding of some courts, the Federal Rules of Civil Procedure contain no special provisions with reference to the pleading of anti-trust suits, as distinguished from other type cases. When the rules were adopted there was considerable pressure

for separate provisions in patent, copyright and other allegedly special types of litigation, but such pressure was rejected and there was adopted a uniform system for all cases. Nagler v. Admiral Corp., supra, 248 F.2d at page 323. As the Second Circuit Court said in Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 978:

> "We see no reason whatever to believe that the Supreme Court intended its liberal rules governing pleadings to be inapplicable to a suit for treble damages."

Thirdly, at this point, the Court is passing only on the sufficiency of the complaint, and not the proof to support it. Darnell v. Markwood, 95 U.S.App.D.C. 111, 220 F.2d 374, 376. How plaintiff may prove its case, and the difficulties it may encounter, are not now before the Court. Karseal Corp. v. Richfield Oil Corp., 9 Cir., 221 F.2d 358, 362, footnote 3.

Section 1 of the Sherman Act (Sec. 1, Title 15 U.S.C.A.) provides:

> "Every contract * * * or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

Section 2 of the Sherman Act (Sec. 2, Title 15 U.S.C.A.) provides:

> "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."

Thus under Sections 1 and 2 of the Act, any conspiracy in restraint of interstate commerce or any monopoly, or attempt to monopolize, or conspiracy to monopolize interstate commerce is illegal.

Bearing in mind the foregoing general principles and the additional principle that in considering the motion to dismiss, under the Federal Rules, the allegations of the complaint must be viewed in the light most favorable to the plaintiff (Chicago & Northwestern Ry. Co. v. First National Bank, 7 Cir., 200 F.2d 383, and cases cited therein) we weigh the allegations of the complaint against the prohibitions of the Act to determine whether a claim upon which relief can be granted is stated.

In the first place, no challenge is made to the sufficiency of the allegations of the complaint with respect to the interstate character of the plaintiff's business. The complaint alleges that defendants entered into a conspiracy and committed the acts which are set out above in this opinion in furtherance of this conspiracy, which acts resulted in the unreasonable restraint of plaintiff's business in interstate commerce; that the purpose of said conspiracy was to prevent plaintiff from carrying on its life insurance business in the State of Montana, and in interstate commerce, and was designed to destroy plaintiff's competitive efforts in the field of life insurance. It is further alleged that as a direct result of said combination and conspiracy, the defendants have furthered their monopolistic aims in the field of life insurance, and that said acts of defendants were in restraint of trade and did constitute a monopoly and were and are an attempt to monopolize the life insurance business, all to the injury of plaintiff and the public. It is further alleged that plaintiff had built up a large and profitable business in the life insurance field, and that as a direct and proximate result of the said conspiracy and the acts committed pursuant thereto, plaintiff's business had been damaged and would in the future continue to be damaged, all to plaintiff's damage in the sum of $1,500,000.

These allegations contain the direct charge that defendants violated both Sections 1 and 2 of the Sherman Act in that they entered into a conspiracy and committed acts in furtherance thereof which were intended to and did restrain plaintiff's interstate business in life insurance, and which constituted an attempt to monopolize the life insurance business. It seems to the Court that these

allegations are allegations of fact, but in any event, they are sufficient to entitle the plaintiff to an opportunity to attempt to prove them. In United States v. Employing Plasterers, Ass'n, 347 U.S. 186, 188, 74 S.Ct. 452, 454, 98 L.Ed. 618, the Supreme Court said:

> "The complaint plainly charged several times that the effect of all these local restraints was to restrain interstate commerce. Whether these charges be called 'allegations of fact' or 'mere conclusions of the pleader,' we hold that they must be taken into account in deciding whether the Government is entitled to have its case tried."

Defendants, however, urge that in order to state a claim for treble damages under the antitrust laws, the complaint must not only show a violation of the act with resulting damage to the plaintiff, but also damage to the public, and that plaintiff's general allegation that defendants' conspiracy and acts pursuant thereto were injurious to the public was insufficient. In support of this position, defendants rely on the cases of Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 214 F.2d 891; Fedderson Motors Inc. v. Ward, 10 Cir., 180 F.2d 519; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, and similar cases. However, as pointed out in Nagler v. Admiral Corp., supra, 248 F.2d at page 324, footnote 5, the validity of the holding in Kinnear-Weed, Fedderson Motors and similar cases is now somewhat doubtful in view of the Supreme Court decisions in U. S. v. Employing Plasterers Ass'n, supra; U. S. v. Employing Lathers Ass'n, 347 U.S. 198, 74 S.Ct. 135, 98 L.Ed. 627, and Radovich v. Nat. Football League, 352 U.S. 445, 77 S.Ct. 390, 395, 1 L.Ed.2d 456. The Court of Appeals for the Ninth Circuit in holding in the Radovich case (231 F.2d 620, 622) that the allegations of public injury were insufficient in that case relied squarely on the Fedderson Motors case, supra, and its decision was reversed by the Supreme Court. Speaking of this problem in the Radovich case, supra, the Supreme Court said:

> "Petitioner's claim need only be 'tested under the Sherman Act's general prohibition on unreasonable restraints of trade,' Times-Picayune Publishing Co. v. U. S., 1953, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277, and meet the requirement that petitioner has thereby suffered injury. Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the anti-trust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 1948, 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328. Furthermore, Congress itself has placed the private anti-trust litigant in a most favorable position through the enactment of § 5 of the Clayton Act. Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534. In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws."

That the complaint herein charges a per se violation of the Sherman Act, and, therefore, one which, as the Supreme Court pointed out in the above quotation, Congress has, by legislative fiat, determined to be injurious to the public seems clear to the Court. It charges particularly a conspiracy to drive the plaintiff out of the life insurance business and eliminate its competitive efforts in the sale of life insurance, and that said conspiracy was an attempt to monopolize. In International Salt Company v. U. S., 332 U.S. 392, at page 396, 68 S.Ct. 12, 15, 92 L.Ed. 20, the Supreme Court said:

> "Not only is price-fixing unreasonable per se [citing cases], but

*also it is unreasonable, per se, to foreclose competitors from any substantial market* [citing cases.] The volume of business affected by these contracts cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious. Under the law, agreements are forbidden which 'tend to create a monopoly,' and it is immaterial that the tendency is a creeping one rather than one that proceeds at full gallop; nor does the law await arrival at the goal before condemning the direction of the movement."

See also Gamco, Inc. v. Providence Fruit & Produce Blg., 1 Cir., 194 F.2d 484, 486, 487; and Darnell v. Markwood, 95 U.S. App.D.C. 111, 220 F.2d 374, 376.

No question has been raised here that the volume of life insurance business alleged to have been affected by the conspiracy is insignificant or insubstantial; and it is charged as a fact that the purpose of the conspiracy was to monopolize and eliminate competition, and as pointed out before, the Court at this point is not concerned with the question of whether plaintiff will be able to substantiate the charge with proof.

 Defendants finally urge that the complaint contains insufficient allegations of actionable private injury. In this connection, it is to be pointed out again that the federal rules make no special provisions with reference to pleading damages in a private antitrust action. As the Ninth Circuit Court said in Karseal Corp. v. Richfield Oil Corp., supra, 221 F.2d at page 362:

"Richfield concedes that damage and proximate cause may be pleaded generally. Such is the law."

Plaintiff alleges that it had built up a profitable life insurance business, and that as a direct and proximate result of the conspiracy of defendants and their acts pursuant thereto, such business had been injured in the past and would continue to be injured to plaintiff's damage in the amount of $1,500,000. Certainly,

such allegations are sufficient allegations of damage and proximate cause, again bearing in mind that at this point the Court is not concerned with how plaintiff will prove the allegations or the difficulties it may encounter.

Accordingly, each of the defendants' motions to dismiss the first count of the complaint is denied.

### Count Two

In Count two, plaintiff seeks to recover for an alleged libel published by the defendants in the form of an advertisement in the Havre Daily News on November 11 and 21, 1955. Each of defendants move to dismiss the count on the ground it fails to state a claim upon which relief can be granted.

In the interests of shortening this already long opinion, the ad will not be set out because all parties concerned are already familiar with it, and only such reference to it as is necessary will be made.

Defendants' position may be briefly summarized as follows: That the publication is not libelous per se and that the complaint fails to allege a libel per quod for two reasons; first, that a libel per quod against plaintiff cannot be alleged on the basis of defamation of plaintiff's policy or agents, and second, that there are insufficient allegations of special damages.

 The Court's jurisdiction of this count, as well as counts 3, 4, 5 and 6, which remain to be considered, is based on diversity of citizenship, and under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the law of Montana, except on matters of procedure is controlling.

 Libel is defined in Montana as

"a false and unprivileged publication by writing * * * which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his oc-

cupation." Section 64–203, R.C.M. 1947.

Words are defamatory per se which upon their face and without aid of extrinsic proof are injurious to the person concerning whom they are spoken. Manley v. Harer, 73 Mont. 253, 235 P. 757; Magelo v. Roundup Coal Mining Co., 109 Mont. 293, 96 P.2d 932; Miller Ins. Agency v. Home Fire & Marine Ins. Co., 100 Mont. 551, 51 P.2d 628. In order to render a publication actionable per se, the language used therein must be susceptible of but one meaning, and that an opprobrious one,[1] Burr v. Winnett Times Pub. Co., 80 Mont. 70, 258 P. 242; Keller v. Safeway Stores, Inc., 111 Mont. 28, 108 P.2d 605. The defamatory words are to be construed according to their usual, popular and natural meaning and common acceptation; that is, in the sense in which persons out of court and of ordinary intelligence would understand them. Daniel v. Moncure, 58 Mont. 193, 190 P. 983; Burr v. Winnett Times, supra.

 However, a defamatory charge does not have to be made in direct, positive language, but impliedly it may be made so it can have only one meaning and may constitute libel per se. Burr v. Winnett Times Pub. Co., supra, at page 245 of 258 P.; Paxton v. Woodward, 31 Mont. 195, 78 P. 215; Caldwell v. Crowell-Collier Pub. Co., 5 Cir., 161 F.2d 333, 53 C.J.S. Libel and Slander § 9, page 46. Also, "It is the law that to assert a suspicion, belief, or opinion is as effectively a libel as though the charge were positively made." Woolston v. Montana Free Press, 90 Mont. 299, 2 P.2d 1020, 1022; Restatement of Torts, Ch. 24, Sec. 566.

 All of the above general propositions concerning the law of libel not only are the law in Montana, but also seem to be the law generally. And while the Montana Supreme Court seems not to have passed on the question, it is well settled that a private corporation may maintain an action for libel respecting its business. 33 Am.Jur., page 183, Restatement of Torts, Ch. 24, Sec. 561; Annotation 52 A.L.R. 1199.

██ Looking at Count two of the complaint in the light of the law of Montana, the Court is of the opinion that the ad published in the Havre Daily News is libelous per se. The ad is headed in large letters "Important Notice! To the Insurance Buying Residents of Northern Montana". Then "If any person(s) or Agent(s) approach you regarding the purchase of Life Insurance and make representations or claims in whole or in part of this nature:" Then follows a list of 7 representations, and the ad continues: "Then we suggest that you have the Agent(s) put these claims down in writing on a proposal and sign the proposal then send the proposal to your State Insurance Commissioner, John J. Holmes, Helena, Montana, for his opinion." It seems to the Court that these words, taken together with the rest of the ad, could convey only one thought to the average person of ordinary intelligence, reading the ad without any extrinsic knowledge, and that is: Beware of any person trying to sell you insurance upon these representations, something is wrong, bring it to the attention of the Insurance Commissioner. In other words, the ad is saying, to use the vernacular, "If anyone attempts to sell you life insurance with this pitch, call a cop". Now, to be sure this does not impute the commission of a crime with the particularity held to be necessary to constitute libel per se in Keller v. Safeway Stores, supra; Woolston v. Montana Free Press, supra; Brown v. Independent Publishing Co., 48 Mont. 374, 138 P. 258, and similar cases, but those cases were concerned with libel per se by means of imputation

---

1. In Miller Ins. Agency v. Home Fire & Marine Ins. Co., supra, however, the Montana Supreme Court speaking of libel which has a tendency to injure the plaintiff in his business or occupation, said [100 Mont. 551, 51 P.2d 632]: "On this phase of 'libel' it is immaterial whether the publication contains opprobrious statements or not. [Citing cases.]"

of a crime. However, under the Montana Statute and cases, libel per se may also result from defamatory words which tend to injure a person in his occupation or business. Certainly, the warning to the general public to "call a cop" if a certain businessman attempts to do business with you is certain to injure that businessman in his business and likewise, the warning to the general public to write the Insurance Commissioner if a certain insurance company tries to sell you insurance upon certain representations cannot do otherwise than injure the business of that insurance company; and if the alleged representations upon which the warning was based were not in fact made by the company, or if in fact made, did not warrant the warning, then publication of the warning was libelous per se. Restatement of Torts, Ch. 24, Sec. 566. It is true that the publication does not refer to an insurance company, but only to agents or persons. However, an insurance company can only do business through agents and persons, there is nothing in the ad which divorces the agents from the company which they represent or differentiate between the agents and the company, and, as hereinafter pointed out, under Montana law, it is sufficient if a plaintiff charges that the publication was made of and concerning it.

Defendants, however, urge that in order for a publication to be libelous per se, the publication must not only on its face, and without the aid of extrinsic circumstances, be defamatory of some person, but that also the person defamed must be ascertainable from the face of the publication without the aid of extrinsic circumstances, and that the identity of plaintiff in this case cannot be ascertained from the ad. Such, indeed, was the holding in the case of Rowan v. Gazette Printing Co., 74 Mont. 326, 239 P. 1035, and that part of the holding in the Rowan case was thereafter cited, apparently with approval, in Campbell v. Post Pub. Co., 94 Mont. 12, 20 P.2d 1063, although the basis of decision in the Campbell case was that the opprobrious

meaning of the publication could not be arrived at without the aid of far fetched innuendo. The Rowan case was also cited in Keller v. Safeway Stores, supra, but not that part of it which held that the defamed person must be ascertainable from the publication without the aid of extrinsic facts in order to be libelous per se. The Court, however, believes that particular portion of the decision in the Rowan case is incorrect, and is directly contrary to the provisions of an express Montana Statute, Sec. 93-3812, R.C.M. 1947, which was in force as Sec. 9175, R.C.M.1921, at the time the Rowan case was decided, and has been continuously in effect in Montana since 1867. The Rowan decision made no mention of that statute, which provides:

"In an action for libel and slander, it is not necessary to state in the complaint any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose; but it is sufficient to state, generally, that the same was published or spoken concerning the plaintiff; and if such allegation be controverted, the plaintiff must establish, on the trial, that it was so published or spoken."

In Nolan v. Standard Publishing Co., 67 Mont. 212, 216 P. 571, 575, which was decided prior to the Rowan case and not overruled by the Rowan case, and which has been cited by the Montana Supreme Court as authority in cases subsequent to the Rowan case, the Court said:

"We are of opinion that under the authorities the publication was libelous per se as to the plaintiff, if under the allegations of his complaint it is competent for him to show that he is the 'ascertained or ascertainable person' towards whom the words were directed, and we now pass to a consideration of that matter."

The Court then reviewed numerous cases decided under statutes similar to ours above quoted, and cited with approval the

following statement from Harris v. Zanone, 93 Cal. 59, 28 P. 845, 846, where the Court was considering a statute identical with 93–3812 above quoted:

"By this provision the inducement and colloquium are dispensed with, and, if the words charged are libelous in themselves, the plaintiff is only required to allege that the libelous words were spoken 'of and concerning the plaintiff.' This is an issuable fact, as was the colloquium under the former system, and, if denied, must be established at the trial."

A similar holding was made in Paxton v. Woodward, 31 Mont. 195, 78 P. 215, which has likewise never been overruled, and has been used as authority by the Montana Supreme Court in cases subsequent to the Rowan case.

Looking at Count two, while it is alleged in Paragraph X on page 11 that the ad was published "of and concerning plaintiff's agents and certain of the benefits and premiums offered by Plaintiff's 'Special Profit Sharing Policy'", which allegation would be insufficient to state a libel against plaintiff, the necessary allegations may be found in other parts of the count. Thus in Paragraph XVI, page 16, the allegation is "That at the time aforesaid defamatory and libelous statements were caused to be published by the defendants of and concerning plaintiff", etc. Again, in Paragraph XI, page 12, appears the allegation that the publication "was understood and accepted by the public as referring to plaintiff insurance company". (See Restatement of Torts, Ch. 24, Sec. 564).

In this connection, it is appropriate here to point out that Count two of the complaint is excessively verbose and in flagrant violation of Rule 8(a) of the Federal Rules of Civil Procedure requiring a short, plain and concise statement. It should not be necessary for the Court to have to minutely examine the complaint to find essential allegations, and in other circumstances the Court would be inclined to summarily dismiss the count

as being in violation of Rule 8(a). However, in view of the length of time this case has been pending and the numerous hearings already had, the Court has attempted to ferret out whatever causes of action may be stated in the complaint in the interest of expediting the case, rather than further delaying it by requiring amendments to state the claims in accordance with Rule 8(a), which would no doubt invite new motions to dismiss and further delay. Much will remain to be done through pre-trial conferences before the case will be finally disposed of, but the Court believes that will be the more expeditious way to handle it.

For the foregoing reasons the separate motions of the defendants to dismiss Count two are denied.

### Count Three

Count three attempts to state a libel based upon the same publication as considered in Count two upon the theory that it imputes the commission of a crime to the plaintiff. No special damages are pleaded.

As pointed out in the discussion of Count two, the Havre publication does not charge the plaintiff with the commission of a crime with the particularity held to be necessary to constitute libel per se in Montana. Keller v. Safeway Stores, supra; Woolston v. Montana Free Press, supra; Brown v. Independent Pub. Co., supra.

Therefore, the motion of each of the defendants to dismiss Count three is hereby granted, and said Count three of plaintiff's complaint is hereby ordered dismissed.

### Count Four

Count four attempts to state a libel based upon the publication which appeared in the Bozeman Chronicle on February 20, 1955. The Bozeman ad charges "strangers in the community" with misrepresenting the terms and benefits of policies that they are offering. If this ad was published of and concerning plaintiff, as is alleged, there is no doubt that it would tend to injure the

plaintiff in its business and would be libelous per se, as pointed out in the discussion with reference to Count two herein.

However, plaintiff makes no allegation that the ad injured it in its business, but bases its claim solely on the ground that the publication charges it with the commission of a crime. The Court is of the opinion that the Bozeman ad fails to charge plaintiff with a crime with the particularity required to be libelous per se under the Montana authorities hereinbefore cited, and since no special damages are alleged, the count is insufficient to charge a libel per quod.

Therefore, the motion of each of the defendants to dismiss Count four of plaintiffs' complaint is hereby granted, and said count is dismissed, and plaintiff is granted 10 days within which to amend said count if it is so advised.

### Count Five

In Count five plaintiff seeks damages for the alleged violation by defendant of Section 40–1940, R.C.M.1947, which provides:

"Inducing owner to forfeit, surrender policy or allow to lapse forbidden. No such insurance corporation or society, and no officer, director, representative, or agent or broker therefor or thereof, or any other person, co-partnership or corporation shall make or issue, or cause to be made or issued, any written or oral statements misrepresenting or making incomplete comparisons for the purpose of inducing or attempting to induce the owner of such policy or contract of insurance to forfeit or surrender such policy or contract or allow it to lapse, for the purpose of replacing such policy or contract of insurance with another."

Defendants' first contention is that Sec. 40–1940 is a penal statute (penalty for its violation is found in the succeeding section, 40–1941, R.C.M.1947), and is such a penal statute that its violation gives no right of private action. In the case of Conway v. Monidah Trust Co., 47 Mont. 269, 132 P. 26, 28, L.R.A.1915E, 500, the Montana Supreme Court, in considering whether violation of a penal statute gave a private right of action for damages, classified penal statutes as follows:

"(a) Those imposing duties to or for the benefit of the municipality or to the public considered as an entity. From such statutes no private right of action arises [citing cases.] (b) Those imposing duties to persons of a particular class. To have a right of action from such a statute one must clearly belong to the contemplated class [citing cases.] (c) Those imposing duties to the public, considered as a composite of individuals, in which case a right of action does arise in one of the public when, and only when, he has sustained some special injury by reason of noncompliance. [Citing cases.]"

Looking as Sec. 40–1940, it seems clear that that statute falls within class (b) referred to by the Montana Supreme Court, statutes which impose duties for the benefit of a particular class. This being so, it seems equally clear that the statute was designed for the protection of insurance companies as well as for the protection of the public. It prohibits interference with contracts of insurance which interference has for its purpose the substitution of a new policy for the one interfered with. Both parties to the contract are protected by the statute, and unless it can be said that insurance policies are gratuitous benefits conferred upon the public by the insurance companies, it cannot be argued that the statute was not designed for the benefit of those companies. Certainly the insurer has as much interest, if not more, in not having its contract of insurance interfered with, as does the insured.

For the violation of a statute classified as class (b) by the Montana Supreme Court, there is no requirement that the plaintiff suffer special damage, or plead special damage, in order to maintain his action.

It is next contended that Count five fails to state facts showing a violation of the statute. Paragraph X charges that defendants caused to be published "a written statement misrepresenting and making an incomplete comparison of plaintiff's insurance policy with other insurance policies for the purpose of inducing, or attempting to induce, owners of policies of plaintiff's life insurance to forfeit or surrender such policies or to allow them to lapse for the purpose of replacing such policy with another." Certainly such allegation charges a violation of the statute and would be sufficient unless by setting forth the publication in toto, plaintiff has shown that the charge is not borne out by the publication.

The ad does state seven alleged representations being made by persons selling insurance. While the ad is couched in the language "if such representations are made", a fair reading of the whole ad conveys the impression that the representations are being made. Plaintiff has in effect alleged that the ad was published concerning it and its policy and that the representations are misrepresentations, and it should be given the opportunity to prove its charge. Likewise, the ad contains a comparison of the alleged interest being offered with the interest earned on an average by 1,000 leading companies and the highest interest earned by one of the companies. There is also set forth the premium rates charged for 20 pay life policies at various ages by the companies represented by the persons signing the ad. To holders of plaintiff's policies, this would afford a comparison between the rates they were paying and the rates alleged to be charged by other companies.

The motions of each of the defendants to dismiss Count five are, therefore, denied.

### Count Six

In Count six plaintiff seeks to recover damages alleged to have been suffered by it as a result of the alleged violation by defendants of Sec. 40–1109, R.C.M.1947. That section is entitled "Abstracting life insurance policies—license and fee", and provides in effect that it shall be unlawful for any person, firm or corporation to engage in the abstracting of life insurance policies without first obtaining a license therefor. In short, the section is a licensing statute, and the violation of such a statute does not give rise to a cause of action for the simple reason that the violation of a licensing statute cannot be the proximate cause of the damage to the plaintiff. In other words, any injury to the plaintiff results from the conduct of the defendant, and not from the defendants' failure to have a license. If the defendants' conduct has injured the plaintiff, the injury would not be any less if the defendants had a license for such conduct, nor would the injury be any greater by virtue of the failure of defendants to obtain a license.

Therefore, the motion of each of the defendants to dismiss Count six is granted, and said count is hereby ordered dismissed.

It Is Further Ordered that defendants have 20 days from the date of receipt of this order within which to answer to the Counts of the complaint which have not been dismissed.

### On Petition for Leave to File Motion to Rehear

The defendants have filed a petition for leave to file a motion to rehear defendants' motion to dismiss Count One of the complaint as amended, and to enlarge the time in which defendants shall answer the complaint, the said petition being based primarily on a recent decision of the Court of Appeals for the Ninth Circuit, Klor's, Inc. v. Broadway-Hale Stores, Inc., 255 F.2d 214, which was decided March 28, 1958.

The Court has read and considered the Klor's case and does not consider that it warrants the Court granting a rehearing of defendants' motion to dismiss Count One of the complaint, as amended, in this case for several reasons:

1. That case is not a pleading case, but was decided on motion for summary

judgment supported by evidence in the form of affidavits. The Circuit Court said, 255 F.2d on page 220: "It should be noted here that the court below did not rule on the pleadings nor grant the motion to dismiss by reason of any failure therein." In the case at bar we are concerned only with the sufficiency of the pleadings at the present time.

2. The Klor's decision simply decided that under the evidence before the Court no public injury was shown, and hence no violation of the Sherman Act, because:

(a) The buying public, despite the alleged restraints of trade, still had numerous sources of supply for the appliances concerned; and

(b) There was no attempt to drive the plaintiff out of the appliance business because the evidence showed plaintiff had available to it for resale appliances which were competitive with those which it was denied as a result of the alleged conspiracy.

Indeed, so far as the Circuit Court opinion shows, it was not even alleged in the Klor's case that there was an attempt to eliminate plaintiff from the appliance business, but the allegations were merely that plaintiff was deprived of the opportunity to buy and sell certain brands of appliances to the damage of its business. While every restraint of trade is not necessarily illegal under the Sherman Act, "if a combination effectively excludes, or tries to exclude, outsiders from the business altogether, it is a monopoly, or an incipient monopoly, and it is unconditionally unlawful," United States v. Associated Press, D.C., 52 F.Supp. 362, 369, affirmed 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. In the case at bar, there is a direct allegation "that the purpose of defendants' conspiracy was to prevent plaintiff corporation from carrying on a life insurance business, both in the State of Montana, and in interstate commerce and to destroy plaintiff corporation's competitive efforts in the sale of live insurance policies."

Now, Therefore, It Is Ordered and this does order that defendants' petition for leave to file a motion to rehear defendants' motion to dismiss Count One of the complaint as amended be and the same hereby is denied.

It Is Further Ordered that defendants' petition to enlarge the time within which defendants shall answer the complaint be and the same hereby is granted and the defendants have to and including May 15, 1958, within which to answer the complaint as amended.

It Is Further Ordered that the Clerk of this court forthwith notify the attorneys of record for the respective parties of the making of this order.

Order June 30, 1958.

Upon having had called to its attention the fact that Section 7 of the Sherman Act was repealed by the Act of July 7, 1955 (69 Stat. 283), 15 U.S.C.A. § 15 note, contrary to what was stated in its Memorandum and Order of March 24, 1958, the Court requested further briefs and argument as to the effect of such repeal of Section 7 of the Sherman Act upon the first cause of action in this case. After a thorough consideration of such briefs and argument the Court is convinced that the repeal of Section 7 of the Sherman Act, by the Act of July 7, 1955, does not destroy the first cause of action, nor take away the Court's jurisdiction thereof.

By the McCarran Act (Chapter 20, Title 15 U.S.C.A.) Congress provided generally that neither the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 15 U.S.C.A. § 12 et seq., nor the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., would be applicable to the business of insurance where such business was regulated by State law. By Section 3(b) of the Act (Section 1013(b), Title 15 U.S.C.A.), however, Congress further provided that "nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation"

in the insurance business. By this provision Congress expressed its intention to still retain control over acts of boycott, coercion or intimidation in the insurance business and adopted the Sherman Act as the means of enforcing that control. The effect of this is that Congress, in the McCarran Act, adopted by reference the provisions of the Sherman Act as it then existed. As stated in 50 Am.Jur., Section 39:

"Effect of subsequent Amendment or Repeal of Adopted Statute.—It is a general rule that when a statute adopts a part or all of another statute, domestic or foreign, general or local, by a specific and descriptive reference thereto, the adoption takes the statute as it exists at that time, and does not include subsequent additions or modifications of the adopted statute, where it is not expressly so declared. The subsequent amendment or repeal of the adopted statute is not within the terms of, and has no effect upon, the adopting statute, where the latter statute is not also amended or repealed expressly or by necessary implication. This rule prevails in the case of the adoption of a specific statute, as distinguished from the adoption of the law generally relating to a particular subject."

The principle embodied in the foregoing quotation has been followed by the United States Supreme Court. Kendall v. U. S., 12 Pet. 524, 37 U.S. 524, 9 L.Ed. 1181; In re Heath, 144 U.S. 92, 12 S.Ct. 615, 36 L.Ed. 358; Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858. The foregoing cases illustrate instances where the reference in the adopting statute is, as in the McCarran Act, to a specific statute, and they hold that when the reference is to a specific statute the adopting statute is not affected by any modification, amendment or repeal of the adopted statute. The reason for and logic of such a rule was explained in Kendall v. U. S., supra, 12 Pet. at page 624 by Justice Thompson when he said:

"It was not an uncommon course of legislation in the states, at an early day, to adopt, by reference, British statutes; and this has been the course of legislation by congress in many instances where state practice and state process has been adopted. And such adoption has always been considered as referring to the law existing at the time of adoption; and no subsequent legislation has ever been supposed to affect it. And such must necessarily be the effect and operation of such adoption; no other rule would furnish any certainty as to what was the law; and would be adopting prospectively, all changes that might be made in the law. And this has been the light in which this court has viewed such legislation."

The case at bar illustrates the wisdom of such rule. Congress, when it passed the McCarran Act in 1945, expressed the intention to make the Sherman Act, including Section 7, applicable to cases of boycott, coercion and intimidation in the insurance business. Ten years later, by the Act of July 7, 1955, Congress repealed Section 7 of the Sherman Act solely for the reason, as stated in the legislative history, that it felt Section 7 was no longer necessary as the private right of action for treble damages granted by that section was more comprehensively covered by Section 4 of the Clayton Act, 15 U.S.C.A. § 15. Certainly Congress, when it enacted the McCarran Act in 1945, did not intend to adopt unseen any change that might be made in the Sherman Act at any time in the future; and likewise in 1955 in repealing Section 7 of the Sherman Act, Congress did not intend to amend the McCarran Act.

In Hassett v. Welch, supra, 303 U.S. at page 314, 58 S.Ct. at page 564, the Supreme Court again repeated the rule as follows:

"A well-settled canon tends to support the position of respondents:

'Where one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted, the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute. * * * Such adoption takes the statute as it exists at the time of adoption and does not include subsequent additions or modifications of the statute so taken unless it does so by express intent."

There is no express intent, or any intent, shown in either the McCarran Act itself or its legislative history to adopt any subsequent additions or modifications that might be made in the Sherman Act. The references in the McCarran Act in Section 1012(b) and 1013(a) are to the Sherman Act as amended, but from the context of the language used in those sections, it is apparent that the reference to the Sherman Act as amended was intended to refer to the Sherman Act as amended up to that time.

To be distinguished from the Kendall, Heath and Hassett cases above referred to are cases such as Panama Railroad Co. v. Johnson, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748; Corry v. City of Baltimore, 196 U.S. 466, 25 S.Ct. 297, 49 L.Ed. 556 and Interstate Consolidated St. Railway Co. v. Com. of Massachusetts, 207 U.S. 79, 28 S.Ct. 26, 52 L.Ed. 111. These latter cases illustrate the other facet of the rule that when the reference in an adopting statute is to the law generally relating to a particular subject, as distinguished from the adoption of a specific statute, all amendments of the general law on that particular subject become a part of the adopting statute.

█ Even if the Court be incorrect in its foregoing views, it is further of the opinion that the first cause of action in this case would be saved by the provisions of Section 109 of Title 1 U.S.C.A.

█ In the first place, contrary to the defendants' contention, while Section 7 of the Sherman Act does in a sense confer jurisdiction on District Courts, it is something more than a jurisdiction-conferring statute. The Supreme Court in United States v. Cooper Corp., 312 U.S. 600, at page 608, 61 S.Ct. 742, at page 745, 85 L.Ed. 1071, referred to Section 7 as a substantive section. The Supreme Court pointed out in De La Rama S. S. Co. v. U. S., 344 U.S. 386, at page 390, 73 S.Ct. 381, at page 383, 97 L.Ed. 422, that there is a difference between the repeal of statutes solely jurisdictional in their scope and the repeal of statutes which create rights and also prescribe how rights are to be vindicated. In the Court's view, Section 7 of the Sherman Act is a statute of the latter type, creating the right in persons injured by violation of the Sherman Act to recover treble damages for such injury and providing that the recovery be had in District Courts.

█ This statute is to be distinguished from the statutes in Bruner v. U. S., 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786, and Hallowell v. Commons, 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409, and similar cases cited by defendant. The statutes involved in those cases were solely jurisdiction-conferring statutes and did not create in the plaintiff any rights. Upon the repeal of such statutes the right which the plaintiff otherwise had still remained but the jurisdiction conferred on a particular tribunal by the statute to enforce the right was taken away, and therefore the saving statute did not apply.

Likewise, to be distinguished is the case of Role v. J. Neils Lumber Co., D.C., 74 F.Supp. 812, decided in this court in 1947. In that case the Court was not concerned with and did not consider the effect of Section 109, Title 1 U.S.C.A. The rule there announced by the Court was undoubtedly the rule of common law in the absence of a saving statute, but the very purpose of a saving statute is to change that rule.

█ The Supreme Court in numerous cases has held that Section 109 of

Title 1 U.S.C.A. furnishes a rule of construction applicable, when not otherwise provided, as a general saving clause to be read and construed as a part of all subsequent repealing statutes in order to give effect to the will and intention of Congress. United States v. Reisinger, 128 U.S. 398, 9 S.Ct. 99, 32 L.Ed. 480; Great Northern Railway Co. v. U. S., 208 U.S. 452, 28 S.Ct. 313, 52 L.Ed. 567; Hertz v. Woodman, 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001.

Reading Section 109, Title 1 U.S.C.A. in connection with Section 3 of the Act of July 7, 1955, which repealed Section 7 of the Sherman Act, as was suggested should be done by the Supreme Court in United States v. Reisinger, supra, the latter section would then read: "Section 7 of the Act approved July 2, 1890 (26 Stat. 210) is repealed, provided, however, the repeal of this section shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such section, and such section shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability." Certainly if the allegations of Count I be taken as true, as they must at this point, the defendants prior to January 7, 1956, the effective date of the repeal of Section 7, had incurred liabilities under Section 7, and the section should be regarded as still remaining in force for the purpose of sustaining the action for the enforcement of such liability.

It would thus appear that the Court has jurisdiction of the first cause of action under Section 7 of the Sherman Act of July 2, 1890, as adopted by the McCarran Act of March 9, 1945, and also under Section 7 of the Sherman Act of July 2, 1890, as saved by Section 109, Title 1 U.S.C.A. Under either theory, jurisdiction springs from Section 7 of the Sherman Act of July 2, 1890 (26 Stat. 209), but Paragraph I of the first cause of action does not allege jurisdiction under that Section. Paragraph I alleges jurisdiction "under and by virtue of the violation hereinafter alleged of the Sherman Antitrust Act, 15 U.S.C.A., Section 1–7 as amended by the Clayton Act, 15 U.S.C.A., Sections 12 through 27 inclusive". Section 7 of the Sherman Act (26 Stat. 209) is not included in Title 15 U.S.C.A. §§ 1 to 7; and there is no jurisdiction in this case by virtue of any provisions of the Clayton Act. Therefore, the jurisdictional allegations of Paragraph I of the first cause of action are technically defective. However, because the matter of jurisdiction has been fully briefed and argued on two separate occasions, and as a result of such briefs and argument the Court is convinced that it has jurisdiction of the first cause of action, leave will be granted to amend Paragraph I to properly set forth that jurisdiction.

The Court has likewise considered the cases cited by defendants in Footnote No. 1 of their supplemental joint brief on the question of boycott. Nothing in those cases causes the Court to change the opinion expressed in its Memorandum and Order of March 24, 1958.

It Is Therefore Ordered and this does order that plaintiff have 10 days within which to amend Paragraph I of the first cause of action to properly set forth jurisdiction, otherwise, said cause of action shall be dismissed.

It Is Further Ordered that in the event plaintiff elects to amend Paragraph I of said first cause of action in accordance with this order, that defendants have 20 days from the date of service of such amendment within which to answer the complaint in this action.

It Is Further Ordered that the order of the Court with respect to interrogatories, dated April 18, 1958, again become operative, but that the times specified in said order commence to run from the date of receipt by the parties of this order.